FILED

2015 DEC 31 PM 1:13

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| ROBERT RIMEL, individually, and on behalf of all others similarly situated, | No. 6:15-CV-2191-Orl-41-KRS |
| Plaintiffs, | JURY TRIAL DEMANDED |
| vs. | CLASS ACTION |
| UBER TECHNOLOGIES, INC. and RAISER, LLC. | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff ROBERT RIMEL, by his attorneys Aylstock, Witkin, Kreis & Overholtz, PLLC brings this action on behalf of himself and all other individuals who have worked or are currently working in the State of Florida as drivers for Defendants Uber Technologies, Inc. and Raiser, LLC (collectively, "Uber").

### INTRODUCTION

1. This case is about thousands of hard-working drivers struggling to get by while Uber, a company valued at more than *$50 billion*, exploits them to bolster its bottom line. Though it likes to call itself a technology company, Uber is a transportation company. Uber does not sell software; it sells rides. And Uber's drivers—like Plaintiffs and the Class they represent—are the lifeblood of the company. Nonetheless, to increase profits, Uber uses its position of power to mislead and take advantage of its drivers at every turn.

2. Uber refuses to pay its drivers a living wage. After accounting for drivers' expenses, which Uber should—but does not—pay, most drivers barely make enough money to make ends meet. Moreover, to further squeeze its drivers, Uber routinely misappropriates money from their fares and shirks its financial commitments.

3. Uber falsifies the employment status of its drivers. Though Uber exercises near complete control over its drivers and many of its drivers work the equivalent of two fulltime jobs for Uber, it classifies drivers as "independent contractors," rather than "employees." Why? So they are not subject to the protections of the Florida State Labor Law, and Uber does not have to pay the costs of compliance (*e.g.*, higher wages and benefits).

4. Uber misrepresents how drivers are paid so that it can keep a larger percentage of the fares they generate. Uber tells customers that gratuity is included in the fares charged when they use Uber's electronic payment service. In reality, Uber fails to remit the gratuity to its drivers.

5. Plaintiff also seeks to recover damages for Uber's: (a) tortious interference with prospective business relations; (b) breach of contract; (c) promissory estoppel; (d) unjust enrichment; (e) conversion; (f) unfair competition; (g) fraud; and (h) failure to pay minimum wage as required by Florida's Minimum Wage Act, Title XXXI, Ch. 440, *et seq.*, and 448.110 *et seq.*

## PARTIES

6. Plaintiff Robert Rimel is a citizen of Orange County, Florida. Plaintiff currently works for Defendant Uber as an UberX driver.

7. Uber Technologies, Inc. is a Delaware corporation headquartered in San Francisco, California that is authorized to conduct business and does conduct business

2

throughout Florida, including in Orange County. It provides a service where individuals can login to a software application on their smartphone, request a ride, and be paired with an available driver.

8. Raiser, LLC, a Delaware limited liability company, is a subsidiary of Uber Technologies, Inc. and is its equivalent for purposes of this action. It is authorized to conduct business and does conduct business throughout Florida, including in Orange County.

9. At all relevant times, Uber was an "employer" within the meaning of all applicable statutes.

10. At all relevant times, the work performed by Plaintiffs and similarly situated employees was directly essential to the business operated by Defendants.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over the controversy pursuant to 28 U.S.C. § 1332(a) because Plaintiffs are residents of the State of Florida and Defendants are foreign corporations incorporated in the State of Delaware with principal offices in the State of California. The amount in controversy exceeds $75,000.

12. Venue is proper in the Middle District pursuant to 28 U.S.C. § 1391 as the events and conduct giving rise to the claims occurred in this District.

## STATEMENT OF FACTS

### A. Plaintiff Robert Rimel

13. Uber compensates its drivers weekly. Uber takes 20% of the total fares and the driver receives the remaining 80%. Because Uber misclassifies its drivers as independent contractors, Plaintiffs had to pay expenses, including gas, tolls, car repairs and lease payments, from their portion of the fare.

14. Uber also deducts a $1 "safe ride" fee from each fare which is allegedly used to pay for background checks, driver safety education and development of safety features in its mobile application – an expense the employer should pay, not the employee.

15. In November of 2014, Plaintiff Rimel began working for Uber as an UberX driver. Plaintiff Rimel continues to work as a driver for Uber.

16. On average, Plaintiff Rimel drives sixty (60) hours per week.

17. Plaintiff Rimel was compensated between $500-$600 per week and incurred between $100-$200 per week in expenses, including gas, tolls, lease payments, and car repairs.

18. Plaintiff Rimel once grossed $330 one day; however, he received only $177.00.

19. Plaintiff Rimel was also charged $10 per month for the use of an iPhone and black box. When Uber became Android compatible, Plaintiff Rimel returned the iPhone and black box and requested that he not be charged the $10 monthly fee. His request was ignored, and he continued to be charged the $10 monthly fee even though he was no longer in possession of Uber's equipment.

20. Plaintiff Rimel contacted Uber numerous times via text and email. The only responses he received were non-responsive to his inquires, particularly concerning the monthly fee. Uber does not provide telephone service to its employees.

21. After expenses, Plaintiff Rimel made an approximate income of $9 per hour.

22. Despite being told by passengers that they were rating him "5 stars" in service, his rating went down, leading to fewer fares. Uber failed to respond to his inquiries.

23. Uber texted Plaintiff Robert Rimel that he could make $17 per hour if he drove during University of Central Florida football games, despite the heavy traffic and congestion. This was deceptive because Plaintiff Rimel failed to earn the guaranteed $17 per hour.

### B. Uber Increases its Profits by Deceiving its Drivers

24. Uber routinely misappropriates money from its drivers' fares. Specifically, Uber deducts a $1 "safe ride" fee from each fare, which is allegedly used to pay for background checks, driver safety education, and development of safety features in its mobile application—an expense that Uber, the employer, should pay.

25. Uber routinely fails to honor its financial commitments to its drivers. For example, Uber's contract provides that drivers must be compensated $5.00 for cancelled fares, but Uber failed to compensate Plaintiff for a majority of cancelled fares. Uber also told Plaintiff that he would receive a credit card that would entitle them to a discount for fuel; however, no card was ever provided.

26. Uber routinely misleads its drivers regarding the amount of money that they can earn. For example, Uber told Plaintiff that drivers can earn guaranteed money working at a certain time. However, Plaintiff did not earn the guaranteed hourly pay that Uber promised its drivers could earn.

### C. Uber Increases its Profits by Misappropriating its Drivers' Tips

27. During the course of their employment, Plaintiff did not receive gratuities.

28. Uber told customers, on its website and in marketing materials, that gratuity is included in the total cost of the fare for the car service and that there is no need to tip the driver:

> DO I NEED TO TIP MY DRIVER?
>
> You don't need cash when you ride with Uber. Once you arrive at your destination, your fare is automatically charged to your credit card on file – there's no need to tip.

29. Uber intentionally misrepresented to customers that gratuity was included in the

5

cost of its fares and thus instructed passengers not to leave a tip in addition to the amount of the fare.

30. Via its training video, Uber also misrepresented to Plaintiff that tips would be added to their wages. Uber told them not to ask for or accept tips because passengers would tip based on service by selecting a percentage on the Uber application, and the tips would be passed on to them.

31. Despite Uber's misrepresentations to customers that "there's no need to tip" and misrepresentations to Plaintiff and other drivers that tips would be added to their wages, Plaintiff and other drivers did not receive their gratuities.

32. As a result of Uber's misrepresentations to customers that gratuity is included in the cost of its service and there is no need to tip drivers, Plaintiff and other Uber drivers have been deprived of payments to which they are entitled.

### D. Uber Misclassifies its Drivers

33. Uber uniformly misclassifies its drivers, including Plaintiff, as independent contractors when they are employees.

34. Uber is involved in marketing its transportation services, qualifying and selecting drivers, regulating and monitoring drivers' performance (including disciplining or terminating those who fail to meet standards), and setting prices.

35. Uber exercises substantial control over the qualification and selection of its drivers. Before working for Uber, applicants must complete Uber's application process, including a background check, city knowledge exam, vehicle inspection, and personal interview.

36. Uber exercises considerable control and supervision over the work details of its

drivers—the manner, methods, and means of its drivers' provision of transportation services. For example, upon signing an agreement to work for Uber, new drivers must watch a video demonstrating how Uber wants them to interact with customers. Drivers are even instructed on such simple tasks as how to pick up a customer with their car. In short, Uber retains all necessary control over its drivers' performance.

37. Uber controls the instrumentalities of Plaintiff's job. Drivers cannot use a car that is more than ten years old and Uber controls its drivers' car registrations.

38. Uber monitors its drivers to ensure compliance with Uber's quality control standards. All drivers for Uber, including Plaintiffs, must maintain an average customer star evaluation of at least 4.5 out of a possible 5 stars. Instructions on how to improve one's star rating are given to drivers who fall below this average in any given week. If a driver fails to maintain an average customer rating of 4.5, Uber deactivates the driver's ability to use the application to pick up customers, an action tantamount to terminating the driver "at will," a hallmark of an employee-employer relationship. Thus, monitoring through rider ratings is an effective mechanism for Uber to enforce its standards.

39. Uber also unilaterally sets the fares—with no negotiation or input from drivers— for all rides, and drivers are required to charge the cost determined solely by Uber. Uber then bills customers for the entire amount before remitting a portion of the fare to its drivers. Uber pays its drivers weekly.

40. Many drivers work well over 40 hours per week for Uber. For example, Plaintiff Rimel works an average of 60 hours per week.

41. Uber claims a proprietary interest in its riders, which further demonstrates that Uber acts as more than a mere intermediary between riders and drivers. For instance, Uber

prohibits its drivers from answering rider queries about booking future rides outside the Uber application or otherwise soliciting Uber riders.

42. As a result of the intentional misclassification of its employees, Uber failed to provide Plaintiff and other similarly aggrieved driver employees with itemized wage statements, minimum wages, and reimbursement for necessary expenses (*e.g.*, gas, tolls, car repairs, and lease payments). Uber also failed to keep accurate payroll records evidencing Plaintiff's and other drivers' hours worked and wages paid and unlawfully retained gratuities owed to Plaintiff and other drivers, despite representing to customers and its drivers that gratuity is included in the total cost of the service.

## CLASS ACTION ALLEGATIONS

43. This action is properly maintainable as a class action pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23.

44. Plaintiff seeks to proceed as a class action on behalf of themselves and the following class of persons: All individuals who are currently or have worked for Defendants as drivers within the State of Florida.

45. Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint. Excluded from the Class are Defendants and its affiliates, parents, subsidiaries, employees, officers, agents, and directors; government entities or agencies, its affiliates, employees, officers, agents, and directors in their governmental capacities; any judicial officer presiding over this matter and the members of their immediate families and judicial staff; and class counsel.

46. The Class members are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. The number and identity of the Class members are determinable from the records of Defendants.

47. At all relevant times, Plaintiff and Class members are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in willful wage and hour violations.

48. The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the court. Although the precise number of such persons is unknown, the facts on which the calculation of that number are presently within the sole control of Defendants, upon information and belief, there are more than forty (40) members of the Class.

49. Plaintiff's claims are typical of those claims, which could be alleged by any member of the Class, and the relief sought is typical of the relief, which would be sought by each member of the Class in separate actions. All the Class members were subject to the same corporate practices of Defendants, as alleged herein. Defendants' corporate-wide policies and practices affected all Class members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class member. Plaintiff and other Class members sustained similar losses, injuries and damages arising from the same unlawful policies, practices and procedures.

50. Plaintiff is able to fairly and adequately protect the interests of the Class and has no interests antagonistic to the Class. Prosecution of separate actions by individual members of

the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties.

51. There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including but not limited to:

    a. Whether Defendant have charged customers a gratuity for class members' services;

    b. Whether Defendant failed to distribute the total proceeds of those gratuities to the class members;

    c. Whether Defendants have informed customers that gratuity is included in the price of the Uber service and so there is no need to tip the drivers;

    d. Whether class members have suffered damages based upon Uber's representation to customers that there is no need to tip the drivers;

    e. Whether Defendants improperly classified class members as independent contractors rather than employees;

    f. Whether class members have been required to pay the expenses of their employment, including the cost of a vehicle, repairs, gas and tolls;

    g. Whether Uber unlawfully denied to compensate its employees, Uber's drivers, those expenses; and

    h. Whether class members were denied employee benefits as required by law.

52. The representative and their chosen attorneys are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this complaint so as to

be able to assist in its prosecution. In addition, the representative's attorneys are competent in the relevant areas of the law and have sufficient experience to vigorously represent the Class. Furthermore, the resources available to counsel ensure that the litigation will not be hampered by a lack of financial capacity. Plaintiff's attorneys have sufficient financial resources and are willing to absorb the costs of the litigation.

## COUNT I
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

53. Plaintiff, on behalf of himself and the proposed Class, repeats and realleges all preceding paragraphs as if fully set forth herein.

54. Uber interfered with the continuing business relationship between drivers and riders—a separate relationship from that between either Uber and its drivers or Uber and its riders, and one to which Uber is not a party—whereby riders would have paid gratuity to drivers, including Plaintiff, absent Uber's interference.

55. Uber intentionally and maliciously interfered with Plaintiffs and other drivers' enjoyment of an expectancy of tips from passengers by intentionally misrepresenting that gratuity was included in the cost of its fares.

56. For example, Uber specifically advertises to its customers that tips are included in the cost of the fare:

### DO I NEED TO TIP MY DRIVER?

You don't need cash when you ride with Uber. Once you arrive at your destination, your fare is automatically charged to your credit card on file – there's no need to tip.

57. In reality, Uber collected gratuities and then failed to remit them to drivers.

58. Based on its past practices of not remitting gratuities to drivers, Uber knew that it was going to retain the tips for itself when it misrepresented that tips would be passed on to

its drivers.

59. Were it not for Uber's misrepresentations regarding gratuities, riders would have left a tip for drivers as is customary in the car-service industry.

60. Uber knew that this would be a benefit accruing to the drivers at the time it discouraged tipping by telling passengers tipping is included in the fare and knew the interference was certain or substantially certain to occur as a result of the conduct.

61. Uber's conduct damaged Plaintiff and other drivers.

## COUNT II
## BREACH OF CONTRACT

62. Plaintiff, on behalf of himself and the proposed Class, repeats and realleges all preceding paragraphs as if fully set forth herein.

63. Uber has an implied contract with Plaintiff and other drivers to remit the total proceeds of all gratuities, as well as to reimburse for expenses.

64. Plaintiff and other drivers are third-party beneficiaries of customers' implied contract with Uber that tips would be remitted to drivers, the terms of which were incorporated by reference from certain advertisements or statements Uber made on various webpages. By entering into this agreement, customers intended to secure a financial benefit for drivers, including Plaintiff, in the form of gratuity and to act directly for the drivers' benefit.

65. Uber withheld and continues to withhold gratuities and has not reimbursed employment related expenses.

66. Uber contracted with Plaintiffs and other drivers to pay surge fares, to provide a credit card entitling drivers to a discount on gas, and to pay $5.00 for cancelled fares.

67. Uber has failed to pay surge fares, to provide a credit card entitling drivers to a

discount on gas, and to pay $5.00 for cancelled fares.

68. Uber's conduct damaged Plaintiff and other drivers.

## COUNT III
## UNJUST ENRICHMENT

69. Plaintiff, on behalf of himself and the proposed Class, repeats and realleges all preceding paragraphs as if fully set forth herein.

70. Defendants unlawfully retained gratuities and cancellation fees owed to Plaintiffs and other drivers and did not reimburse expenses.

71. Defendants obtained these benefits from Plaintiff and drivers by making material misrepresentations and taking advantage of Plaintiff and drivers.

72. As a result, Defendants have been unjustly enriched through their retention gratuities owed to the drivers as well as expenses.

73. Plaintiff and the class members are entitled to restitution for their full share of the proceeds of the improperly retained gratuities and expenses.

## COUNT IV
## CONVERSION

74. Plaintiff, on behalf of himself and the proposed Class, repeats and realleges all preceding paragraphs as if fully set forth herein.

75. Plaintiff and other drivers had the right to possession of tips, surge fares, cancellation fees and money spent for expenses.

76. Defendants unlawfully took Plaintiff's personal property without Plaintiff's permission and retained the property for its own benefit.

77. As a result, Plaintiff was harmed and class members are entitled to restitution for their full share of proceeds, as well as treble damages.

## COUNT V
## UNFAIR COMPETITION

78. Plaintiff, on behalf of himself and the proposed Class, repeats and realleges all preceding paragraphs as if fully set forth herein.

79. Plaintiff and other drivers' property—gratuities, surge fares, and cancellation fees—was misappropriated by Uber for its commercial advantage.

80. Uber's conduct damaged Plaintiff and other drivers.

81. Uber represented to Plaintiff and other drivers that they would receive gratuities, surge fares, and cancellation fees. Uber did not pay these monies as promised.

## COUNT VI
## FRAUD AND MISREPRESENTATION

82. Plaintiff, on behalf of himself and the proposed Class, repeats and realleges all preceding paragraphs as if fully set forth herein.

83. Defendants made a material representation of fact, that Plaintiff would receive gratuities, which was untrue, which Defendants knew was an untrue statement, with the intent to deceive, which Plaintiffs justifiably relied upon, causing Plaintiff to incur damages.

84. Defendants also informed Plaintiff and proposed class members that they would receive a cancellation fee refund if a passenger cancelled, which Defendants knew was an untrue statement at the time, with the intent to deceive, which Plaintiff justifiably relied upon, causing Plaintiff to incur damages.

85. Defendants made a material representation of fact, that Plaintiff would receive a card for discounted gas, which Defendants knew was an untrue statement at the time, with the intent to deceive, which Plaintiff justifiably relied upon, causing Plaintiff to incur damages.

86. Plaintiff and other drivers reasonably and justifiably relied on these

misrepresentations and continued to drive for Uber because Uber was their employer and the party responsible for overseeing the payment of these monies.

## COUNT VII
## VIOLATIONS OF FLORIDA STATE LABOR LAW

87. Plaintiff, on behalf of himself and the proposed Class, repeats and realleges all preceding paragraphs as if fully set forth herein.

88. Despite the existence of an agreement indicating Plaintiffs are independent contractors, the treatment of Plaintiff and control exercised by Uber indicate that Plaintiffs are employees.

89. Accordingly, Uber's actions violate Florida's Minimum Wage Law, Title XXXI, Ch. 448, Section 110 *et seq.*

90. As a result of Uber's violations, Plaintiff is entitled to recover the wages and benefits withheld in violation of Florida State Labor Law as well as attorneys' fees pursuant to Title XXXI, Ch. 448, Section 8 and Section 104. In addition, Plaintiff seeks the imposition of penalties on the Defendant Uber with respect to the applicable provisions of Florida State Labor Law.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the proposed class, requests relief against each Defendant as follows:

a. An award of damages, including compensatory, punitive, and treble damages, as well as back pay, in an amount to be determined at trial;

b. Notice to the Classes of the action;

c. An injunction against Defendant prohibiting Defendant from engaging in each of the unlawful practices, policies and patterns set forth herein;

d. Liquidated damages, including back pay;

e. Reasonable attorneys' fees and costs of this action;

f. Pre-judgment and post-judgment interest as provided by law; and

g. An Order requiring that Defendant return to Plaintiffs any gratuities and any other funds wrongfully kept by Defendants;

h. Such other and further relief that the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs, on behalf of themselves and the proposed class, demand a trial by jury on all claims so triable.

Dated: December 30, 2015

Respectfully submitted,

Neil D. Overholtz (Lead trial Counsel - FBN 188761)
Stephen H. Echsner (FBN 304719)
Aylstock, Witkin, Kreis & Overholtz, PLLC
17 E. Main Street.
Suite 200
Pensacola, Florida 32502
Tel: 850-202-1010
Fax: 850-916-7449

*Attorneys for Plaintiffs and Class*